# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>               Plaintiff,<br><br>vs.<br><br>TREVOR BIRDSBILL,<br><br>               Defendant. | CR-19-63-GF-BMM<br><br><br>ORDER ON DEFENDANT'S<br>MOTIONS TO SUPPRESS<br>(DOCS. 48 AND 51) |

## INTRODUCTION

Defendant Trevor Birdsbill ("Birdsbill") is charged by Indictment with one count of Aggravated Sexual Abuse in violation of 18 U.S.C. §§ 1153(a) and 2241(a)(1). The charge stems from an alleged sexual assault on the Fort Peck Indian Reservation. Birdsbill moves to suppress the statements that he made to federal law enforcement on three separate occasions and penile swabs collected from Birdsbill by tribal law enforcement on the night of his arrest. The Government opposes Birdsbill's motions.

The Court conducted a hearing on the motions on October 19, 2020. The Government presented testimony from responding Fort Peck Tribal Officer Chris Grey Bear, Wolf Point Police Officer Kahlil Wehbe, Fort Peck Tribal Criminal

Investigator Sean Red Boy, Kara Gregor, and Federal Bureau of Investigation (FBI) Special Agent Harry Murphy.

## BACKGROUND

The Court makes the following factual findings based on the exhibits in the record and the testimony presented at the suppression hearing.

*Arrest on October 30, 2018, and collection of penile swabs*

Fort Peck tribal law enforcement was dispatched on October 30, 2018, to a house in Wolf Point, Montana, on a report of sexual assault. Dispatch reported Birdsbill as one of two suspects in the crime, and relayed that Birdsbill had left the house in a green car. Tribal law enforcement requested assistance from the Wolf Point Police Department in apprehending Birdsbill.

Wolf Point Police Officer Mehsin Wehbe located the car Birdsbill was believed to be driving, and arrested Birdsbill at the request of the Fort Peck law enforcement on tribal charges. Officer M. Wehbe placed Birdsbill in the back of Wolf Point Police Officer K. Wehbe's patrol car. Officer K. Wehbe advised Birdsbill of his tribal rights and observed the odor of alcohol on Birdsbill's breath. Officer K. Wehbe requested that Birdsbill take a preliminary breath test. Birdsbill consented to the breath test and his breath sample registered a 0.191% blood alcohol level.

Officer K. Wehbe then transported Birdsbill to Tule Creek, a vehicle turn-around on the side of the highway. Officer K. Wehbe released Birdsbill at Tule Creek to Fort Peck Tribal Officer Michael Booth. Officer Booth transported Birdsbill to the Fort Peck Adult Correctional Facility in Poplar, Montana. Officer Booth led Birdsbill to a booking room upon arrival to the tribal jail. Investigator Red Boy later entered the booking room, told Birdsbill of the accusations against him, and advised Birdsbill that "penile swabs needed to be collected at that time." Birdsbill cooperated and Investigator Red Boy collected Birdsbill's clothing and two penile swabs.

Members of the FBI Laboratory subsequently tested the penile swabs and concluded that the swabs contained both male and female DNA. The DNA results provided that it is "680 sextillion times more likely if [the alleged victim] and an unknown, unrelated person are contributors than if two unknown, unrelated people are contributors."

*Interview on November 3, 2018*

FBI Special Agent Murphy visited the tribal jail in Poplar, Montana, on November 3, 2018, to interview Birdsbill as part of a federal investigation into the alleged October 30, 2018 sexual assault. Ex. 501. Agent Murphy presented Birdsbill with an "Advice of Rights" form, listing Birdsbill's *Miranda* rights as follows:

3

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions.

You have the right to have a lawyer with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you have the right to stop answering questions at any time.

Doc. 59-1. The recording of the November 3, 2018 interview began as Birdsbill is partway through reading his rights aloud. Ex. 501. Agent Murphy then explained why he provided Birdsbill with the Advice of Rights form, stating, "So, because you're in custody, you're in jail, we have to make you aware of your rights." *Id.*

Agent Murphy told Birdsbill that law enforcement "want[s] to get [Birdsbill's] side of the story," but "to do that, though, you need to sign that [form] and tell us that you want to talk to us. If you don't wanna talk to us, you don't have to, and we'll get up and we'll leave." *Id.* Birdsbill immediately responded that he wanted to "get my, uh, I want somebody to be present with me." *Id.* Officer Murphy asked, "Okay, are you tribally represented right now?" Birdsbill replied, "I don't know yet. I put in my thing, I am just trying to figure that out right now." *Id.* Agent Murphy then clarified, "So right now you don't have a tribal lawyer,

4

correct?" *Id.* Birdsbill responded that he did not know at that moment. *Id.* Agent Murphy took back the Advice of Rights form because "there [was] no need for [Birdsbill] to sign it at all, and then that's all we'll have" in terms of an interview. *Id.*

Birdsbill advised Agent Murphy that he was "trying to get" someone, and struggled to remember a name. *Id.* Agent Murphy volunteered, "Terry Boyd?" as Birdsbill continued to try to remember. *Id.* Birdsbill described the general location of an office, and Agent Murphy tried, "Bob Welch?" *Id.* Birdsbill confirmed that Bob Welch was the person he was "trying to get." *Id.*

The "Bob Welch" to whom Birdsbill referred serves as a Fort Peck tribal lay advocate, not a licensed attorney. Agent Murphy failed to advise Birdsbill of this distinction in the November 3, 2018 interview. Agent Murphy instead said, "Well I'll tell you what, once you do get hooked up with [Bob Welch], if you want, get ahold of [Investigator] Sean Red Boy and set up an interview." *Id.* Birdsbill concluded, "Sounds good." *Id.*

*Interview on December 3, 2018*

The second interview between Birdsbill and Agent Murphy occurred on December 3, 2018, in lay advocate Bob Welch's office. Agent Murphy began the recording by reciting the date, time, and location of the interview and stated that Bob Welch was the tribal lay advocate for Birdsbill "in this matter." Ex. 502.

Agent Murphy indicated that he had given Birdsbill the Advice of Rights form, and told Birdsbill that he could end the interview anytime he wanted. *Id.* Agent Murphy advised Birdsbill that "nothing [Birdsbill] says here today is gonna land you in handcuffs. You're not going to jail today. We're just here to ask you some questions and after that, we're gonna go our way, and you're gonna go your way." *Id.*

Agent Murphy asked if Birdsbill had any questions about the Advice of Rights form.  Birdsbill took a moment, apparently to read over the rights.  He stated, "umm, is that, uh, 'before?'" in reference to one of the listed rights. *Id.* Agent Murphy responded, "Yeah, so this one says you have a right to talk with a lawyer for advice before we ask any questions. So, while Mr. Welch is not a lawyer, he is a lay advocate, so he's here in that capacity for you." *Id.* Birdsbill signed the Advice of Rights form and the interview commenced.

*Interview on May 24, 2019*

The third interview between Birdsbill and Agent Murphy occurred on May 24, 2019, again in tribal lay advocate Bob Welch's office. Agent Murphy began by reciting the time, date, and location of the meeting. Agent Murphy asked Birdsbill if Bob Welch "is [Birdsbill's] lay advocate for this matter, is that right?" Ex. 503. Birdsbill responded, "Yeah." *Id.* Welch interjected, "for tribal court stuff." *Id.* Agent Murphy agreed, "for tribal court matters, yep." *Id.* Agent Murphy again

6

presented Birdsbill with an Advice of Rights form, asked if Birdsbill could read the form, and told Birdsbill that if he "wants an interview to occur, go ahead and sign it. If you don't, then we'll stop it right now and that's that." *Id.*

Agent Murphy told Birdsbill that "nothing [he] says here today will land [him] in handcuffs, you've got my word on that. . . . You're gonna go your way, and I'll go back to Glasgow, and we'll all have a good long weekend." *Id.*

Agency Murphy emphasized that, "although [Welch] is your lay advocate, you also have a right to, um, a licensed attorney for this interview." *Id.* Birdsbill explained that he could not afford an attorney and asked the costs of hiring a certain attorney. *Id.* Birdsbill said, "I mean I could get that money but it would take me about a month or two." *Id.* Agent Murphy responded, "Right," and proceeded into questioning Birdsbill about the sexual assault allegations. *Id.*

In the ensuing discussion, Agent Murphy told Birdsbill how federal courts are different, that federal courts look favorably on those who are honest, and that acceptance of responsibility "might translate to a break" at sentencing. *Id.* Agent Murphy showed Birdsbill the DNA report. They discussed what happened on the day of the sexual assault allegations.

Birdsbill eventually admitted, approximately 33 minutes into the interview recording, that he had sex with Jane Doe II on the day of the incident, but not Jane Doe. Agent Murphy asked Birdsbill whether he wore a condom and Birdsbill

7

responded that "it was consensual." *Id.* Agent Murphy again asked whether

Birdsbill wore a condom, to which Birdsbill replied, "I did, actually." *Id.* Birdsbill

then stated, 36 minutes into the interview, "And, pretty much that's, you know

what I mean, that's all I got to tell you." *Id.* Agent Murphy asked, "You sure? This

is your one shot. I don't come back and beg people to tell the truth. Would there be

any reason why your DNA would have been collected on [Jane Doe's] sexual

assault kit?" *Id.* Birdsbill replied, "No." *Id.*

Agent Murphy again advised Birdsbill that he was "making things harder for

[him]self and harder for [his] family with this." *Id.* Agent Murphy told Birdsbill

that he was "going to spend more time messing with this, than at home taking care

of your [children] because of the decisions you're making right now." *Id.* Birdsbill

remained silent. Agent Murphy said, "I want you to tell me what happened that

night between you and [Jane Doe], and get this all of your chest, and be done with

it. And you won't have to tell anybody again. I wanna hand this report over to the

prosecutor, and say, 'Hey, Trevor was stand-up. He told the truth. He hasn't been

accused of this before, and, he told the truth like a man.' I can't do that right now."

*Id.* Birdsbill asked, "Why?" *Id.* Agent Murphy explained that it was because he

knew Birdsbill was not telling the truth, because he had done this before and

because of the DNA report.

Birdsbill stated, "I told you what I told you." *Id.* Agent Murphy responded, "You're gonna stick with that then?" but then continued to ask questions about the night of the incident. *Id.* Birdsbill again stated, "I told you what I told you. I was with [Jane Doe II]." *Id.*

Agent Murphy showed the DNA report to Birdsbill and explained that buccal swabs had been taken from Jane Doe and Jane Doe II. He told Birdsbill that a DNA report "doesn't lie" and that the report showed there is a "680 sextillion chance" that the DNA from the penile swabs belonged to Jane Doe. *Id.* Birdsbill again stated that he was with Jane Doe II. After a pause, Birdsbill asked, "So, where do we go from here?" *Id.* Another voice responded, telling Birdsbill that the federal prosecutor would decide. The interview proceeded for another 10 minutes, during which Agent Murphy repeatedly stated his disappointment with Birdsbill's lack of cooperation. Birdsbill then made vague admissions like, "it just sort of happened, you know." *Id.*

## DISCUSSION

### I.  **Motion to Suppress**

Birdsbill argues that the statements that Agent Murphy elicited violated Birdsbill's Fifth and Sixth Amendment rights. Birdsbill alleges the following constitutional defects in law enforcement's interrogations: (1) Birdsbill's *Miranda* waiver of his right to counsel was not knowing and intelligent; (2) Law

enforcement's repeated promises to Birdsbill—that Birdsbill would not go to jail "today" for anything he told Agent Murphy—rendered Birdsbill's statement involuntary; and (3) Law enforcement violated Birdsbill's Fifth Amendment right to remain silent by continuing to question Birdsbill after his statement, "that's all I got to tell you." (Doc. 49 at 8.)

### a. Noncustodial interrogation of Birdsbill

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." Law enforcement jeopardizes the privilege against self-incrimination where it takes an individual into custody, or otherwise deprives the person of their freedom, in any significant way and subjects them to questioning. *Miranda v. Arizona*, 384 U.S. 436, 478 (1966). *Miranda*'s procedural safeguards protect people against the coercive nature of custodial interrogations. *DeWeaver v. Runnels*, 556 F.3d 995, 1000 (9th Cir. 2009). Once properly advised of their *Miranda* rights, a suspect may waive their right to an attorney only if the waiver is voluntary, knowing, and intelligent. *Miranda*, 384 U.S. at 475. *Miranda* only applies, however, when an individual is "in custody." *Berkemer v. McCarty*, 468 U.S. 420, 428 (1984).

Courts look to multiple factors to determine whether a person is "in custody" pursuant to *Miranda*. *United States v. Hayden*, 260 F.3d 1062, 1066 (9th Cir. 2001). Those factors include "(1) the language used to summon the individual; (2)

the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." *Id.* This Court must ask whether a reasonable person under a totality of circumstances would conclude that they are not free to leave. *Id.*

Applying the factors from *Hayden* to the facts of the present case, the Court finds that Birdsbill was not "in custody" for purposes of a *Miranda* inquiry during the two interviews at the office of his tribal lay advocate Bob Welch. Agent Murphy appeared calm and professional in tone throughout the interviews with Birdsbill. Agent Murphy did not confront Birdsbill with alleged evidence of his guilt until the end of the third interview, when Agent Murphy showed Birdsbill the DNA report. The second and third interviews took place in tribal lay advocate Bob Welch's office, not a jail, police station, or other location indicative of custody. The interviews were not excessively long. The December 3, 2018 interview lasted less than 30 minutes, and the final May 24, 2019 interview concluded in under an hour.

The noncustodial nature of the second and third interviews failed to trigger Birdsbill's right to court-appointed counsel under *Miranda*. *See, e.g.*, *Beckwith v. United States*, 425 U.S. 341, 344-48 (1976). The Court declines to suppress Birdsbill's statements to Agent Murphy on these grounds.

11

### b. Voluntariness

Birdsbill also challenges the voluntariness of his statements. An admissibility analysis requires this Court to assess whether Birdsbill voluntarily made the statements to Agent Murphy, regardless of whether *Miranda* applies to the statements at issue. "Due process does not bar the use of a confession unless government officials employed coercive interrogation tactics which rendered the defendant's confession 'involuntary' as a matter of law." *United States v. Miller*, 984 F.2d 1028, 1030 (9th Cir. 1993) (quoting *Colorado v. Connelly*, 479 U.S. 157, 163-65 (1986)). Courts look to a totality of the circumstances to determine whether a confession was voluntary. *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988). The critical question in a voluntariness inquiry is whether the defendant's "will was overborne" when making the confession. *Miller*, 984 F.2d at 1030. The Government bears the burden of proving by a preponderance of the evidence that a defendant's confession was voluntary. *Lego v. Twomey*, 404 U.S 477, 489 (1972).

Birdsbill asserts that Agent Murphy's statements—that nothing Birdsbill said in the December 3, 2018 and May 24, 2019 interviews would land him in jail that day—were improperly coercive and rendered Birdsbill's statements involuntary. The Court disagrees. Law enforcement officers are permitted to confront defendants with evidence, appeal to defendants' emotions, and even

provide false or misleading information to defendants during confessions. *See, e.g.*, *United States v. Moreno-Flores*, 33 F.3d 1164, 1168-70 (9th Cir. 1994) (finding a defendant's confession to be voluntary despite officer's false statements to defendant regarding cocaine found and the seriousness of the accusations); *Fracier v. Cupp*, 394 U.S. 731, 737-39 (1969) (permitting admission of a defendant's confession despite officer's false statements regarding co-defendant's confession to the crime); *Ortiz v. Uribe*, 671 F.3d 863, 869-72 (9th Cir. 2011) (allowing a confession obtained after police appealed to a defendant's moral obligation to his family).

In the present case, it is clear that Birdsbill's interview statements were voluntarily made and were not the product of police coercion. Birdsbill gave the statements to Agent Murphy in lay advocate Bob Welch's office. Birdsbill was not in custody during the interviews and had not been formally charged for the alleged crime. Law enforcement made Birdsbill aware of the nature of the offense, and told Birdsbill repeatedly that it was his choice to participate in the interviews. Agent Murphy's assertions that Birdsbill was not going to jail *today* placed a temporal limitation on when the Government would use any incriminating statements that Birdsbill divulged in the interviews. Agent Murphy's actions did not rise to the level of coercion so as to render Birdsbill's statements involuntary. The Court finds

that Birdsbill made the statements under his own volition, and, therefore, declines to suppress his statements on these grounds.

### c. Right to remain silent

Birdsbill's final argument on his Motion to Suppress Statements (Doc. 48) argues that Agent Murphy violated Birdsbill's right to remain silent in the final May 24, 2019 interview. Approximately 36 minutes into the interview, Birdsbill told Agent Murphy, "And . . . pretty much that's, you know what I mean, that's all I got to tell you." Ex. 503. Birdsbill argues that anything made after his statement—"that's all I got to tell you"—was obtained in violation of Birdsbill's Fifth Amendment right to remain silent. The Government argues that Birdsbill's statement is ambiguous because it could have a number of different meanings.

If a person under questioning "indicates in any manner that he does not wish to be interrogated, the police may not question him." *Miranda*, 384 U.S. at 445. A defendant's invocation of the right to remain silent must be unambiguous. *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010). Law enforcement must terminate an interrogation where an individual indicates that he wishes to remain silent in any manner and at any time prior to or during questioning. *Miranda*, 384 U.S. at 473-74. Courts conduct an ambiguity inquiry under an objective standard. *Berghuis*, 560 U.S. at 382.

14

In *Jones v. Harrington*, the Ninth Circuit assessed whether the defendant's statement, "I don't want to talk no more," constituted a proper invocation of the right to remain silent. 829 F.3d 1128, 1137 (9th Cir. 2016). The Ninth Circuit determined that the statement was sufficient to "indicat[e] *in any manner* that [the defendant did] not wish to be interrogated." *Id.* at 1137 (quoting *Miranda*, 384 U.S. at 445).

Unlike the defendant in *Jones*, here, Birdsbill's invocation, "That's all I've got to tell you," could reasonably be interpreted as equivocal when viewed objectively and contextually. "That's all I've got to tell you" could be interpreted to mean "that's all that I remember"; "that's the best description I've got"; "I've answered your question about that"; or "I don't have anything else to say on that topic." The existence of many possible interpretations of Birdsbill's statement evidences the ambiguity of his invocation. The Court denies Birdsbill's Motion to Suppress Statements (Doc. 48) on this third and final ground.

## II.    Motion to Suppress Penile Swabs

Birdsbill separately alleges that tribal Investigator Red Boy did not have a warrant to collect the penile swabs on October 30, 2018. Birdbill asserts that the warrantless collection of the penile swabs intruded upon his Fifth Amendment right against self-incrimination and violated his Fourth Amendment right against unreasonable search and seizure. He urges the Court to suppress any evidence

obtained as a result of the penile swabs. Birdsbill does not challenge whether Investigator Red Boy had probable cause to obtain the sample. The Government concedes that the collection of penile swabs contitutes a "search" for which a warrant is generally required. The Government asserts, however, that no warrant was required because the search of Birdsbill fell within the exigent circumstances exception to the warrant requirement.

The Fourth Amendment guarantees the right to be free from unreasonable search and seizure. The Fourth Amendment's "overriding function" protects personal privacy and dignity against unwarranted intrusion by the State. *Schmerber v. California*, 384 U.S. 757, 767 (1966). Searches and seizures conducted without a warrant are presumptively unreasonable. *Kentucky v. King*, 563 U.S. 452, 459 (2011). The Government may overcome this presumption, however, because "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Id.*

A warrantless search of a person "is reasonable only if it falls within a recognized exception." *Missouri v. McNeely*, 569 U.S. 141, 148 (2013) (citing *United States v. Robinson*, 414 U.S. 218, 224 (1973)).  One well recognized exception applies where exigent circumstances "make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment." *McNeely*, 569 U.S. at 148-49 (quoting *King*, 563

U.S. at 460).  Potentially reasonable warrantless searches occur where, under the totality of the circumstances, the Government shows the existence of a "compelling need for official action and no time to secure a warrant." *McNeely*, 569 U.S. at 149. Courts evaluate allegations of general exigency on a case-by-case basis. *Id.* at 150.

The Government argues that exigency arose because Birdsbill could have "easily wiped away or destroyed" the DNA evidence collected by the penile swabs. (Doc. 55 at 6-9.) The Government contends that Birdsbill's actions when he "fle[d] the scene of the crime" and "attempt[ed] to influence the breathalyzer results" administered by Officer K. Wehbe demonstrate Birdsbill's potential inclination to destroy the penile evidence. The Government cites a number of cases in support of its contention, including *Cupp v. Murphy*, 412 U.S. 291 (1973); *Aknin v. Holland*, 2016 WL 4524309 (N.D. Cal. Aug. 30, 2016); *United States v. Door*, 2018 WL 2364292 (D. Mont. May 24, 2018); and *Ontiveros v. State*, 240 S.W.3d 369, 371-72 (Tex. Ct. App. 2007), none of which this Court finds persuasive in the present matter.

*Cupp* involved the potential destructibility of evidence under a suspect's fingernails. The suspect was not under formal arrest, but "was obviously aware of the [questioning] detectives' suspicions." *Cupp*, 412 U.S. at 296. In fact, "[t]estimony at trial indicated that after [the suspect] refused to consent to the

17

taking of fingernail samples, [the suspect] put his hands behind his back and appeared to rub them together. He then put his hands in his pockets, and a 'metallic sound, such as keys or change rattling' was heard." *Id.* These actions by the suspect "justified the police in subjecting [the suspect] to the very limited search necessary to preserve the highly evanescent evidence they found under his fingernails." *Id.*

In *Aknin*, a habeas petitioner alleged several ineffective assistance of counsel claims. The petitioner asserted that counsel had been deficient when they failed to move to suppress evidence obtained without a warrant, including swabs of the petitioner's genitals and combing of his pubic hairs. *Aknin*, at *15. The court in *Aknin* surveyed the few cases that had examined similar issues. This survey resulted in the court's finding that the limited available case law made it improper to conclude that the petitioner's trial counsel provided constitutionally ineffective assistance to the petitioner at trial by failing to file a suppression motion. *Id.* The *Aknin* court also attributed its holding to the possibility that counsel's decision not to object to the introduction of the genital swabs could have been a strategic part of the petitioner's defense. *Id.* at *14. *Aknin*'s brief overview of cases, and the limited context of its reasoning, proves unhelpful in the present matter.

*Door* likewise proves distinguishable from Birdsbill's situation. Like *Aknin,* the petitioner in *Door* asserted several ineffective assistance claims against his trial

counsel. One argument included allegations that his counsel should have objected to the introduction of buccal swabs and clothing evidence obtained by law enforcement without a warrant. *Door*, at *3. The collection of the buccal swabs in *Door* was found permissible because "swabbing a defendant's face, hands, and fingernails is a *slight intrusion* on parts of the body that are regularly exposed to public view." *Id.* at *4 (emphasis added). The *Door* court's finding of reasonableness hinged on the buccal swabs being only a "slight intrusion," hardly comparable to the penile swabs collected from Birdsbill in the present case. *Id.*

In *Ontiveros*, a Texas intermediate appellate court permitted the warrantless swabbing of a defendant's penis because, although the defendant had been handcuffed when police collected the swab, the possibility remained that the defendant could have urinated in his pants and damaged any DNA evidence. *Ontiveros*, 240 S.W.3d at 372. This Court declines to adopt the reasoning in *Ontiveros*. The reliance on speculative scenarios from within a realm of possibilities hardly evidences an exigent need on the part of law enforcement.

The Court first points out that Birdsbill had been arrested and handcuffed behind his back since being place into the patrol car of Officer K. Wehbe. Birdsbill remained handcuffed and under observation by three officers in the booking room at the Fort Peck tribal jail where tribal Investigator Red Boy undertook the warrantless search. The facts here do not involve the taking of fingernail samples

or other standard booking procedures. Collection of penile swabs involves a substantially intrusive procedure that invades a person's most intimate body parts. Case law counsels the "indisputable and great" "importance of informed, detached and deliberate determinations of the issue [of] whether or not to invade another's body in search of evidence of guilt." *Schmerber*, 384 U.S. at 770 (providing that a search "be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime"). The Court finds that the collection of penile swabs from Birdsbill required a warrant based on a review of the totality of the circumstances.

From the time dispatch notified law enforcement of the report of sexual abuse at 6:44 p.m., to Birdsbill's arrest, and up until the collection of penile swabs in the booking room hours later, law enforcement had ample opportunity to seek a search warrant. Wolf Point police immediately notified tribal law enforcement of Birdsbill's arrest. Wolf Point police officers transported Birdsbill to Tule Creek to hand him over to Fort Peck Officer Booth. Officer Booth transferred Birdsbill to Poplar, Montana, over twenty miles from where Birdsbill had been arrested in Wolf Point. Investigator Red Boy testified at the motion hearing that he never sought a search warrant for Birdsbill's penile swabs, despite his experience obtaining search warrants in other crimes.

20

Birdsbill admittedly left the scene after the alleged sexual assault occurred, but he was apprehended by Wolf Point law enforcement shortly thereafter. Officer K. Wehbe testified to the successful administration of a breathalyzer test upon Birdsbill's consent, a revelation that undermines the Government's arguments that Birdsbill allegedly "attempt[ed] to influence the breathalyzer results." Unlike the suspect in *Cupp*, Birdsbill never gave law enforcement any indication of an attempt to destroy DNA evidence on his penis. Birdsbill remained handcuffed, and was seated in a booking room with at least three other officers, when Investigator Red Boy collected the swabs.

The Government has failed to show that sufficient exigent circumstances required the warrantless collection of the penile swabs. The Court grants Birdsbill's Motion to Suppress Penile Swabs (Doc. 51). Any evidence obtained as a result of the collection of the penile swabs, and conclusions drawn from testing the swabs, will be inadmissible at trial as fruits of the poisonous tree. The Court recognizes the impact that its finding may have on the December 3, 2018 and May 24, 2019 interviews, wherein Agent Murphy briefly referenced the DNA report. Agent Murphy's references to the DNA report in the interviews, despite the report's connection to an unconstitutional search, were permissible so long as Agent Murphy's mentions of the DNA report were not coercive in conjunction with the remaining circumstances. The Court already has discussed the

21

voluntariness of Birdsbill's statements and the reasonableness of Agent Murphy's interview techniques. The Court directs the government to produce a redacted recording of the interviews at trial with all references to the penile swabs and subsequent DNA report removed.

### ORDER

Accordingly, **IT IS ORDERED:**

1.   Birdsbill's Motion to Suppress Statements (Doc. 48) is **DENIED**.

2.  Birdsbill's Motion to Suppress Penile Statements (Doc. 51) is

   **GRANTED.**

   Dated this 20th day of October, 2020.


_____
Brian Morris, Chief District Judge
United States District Court